**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION - CLEVELAND**

| | | |
|---|---|---|
| ESTATE OF DERRICK SMITH, et al., | : | Case No. 1:25-cv-881 |
| | : | |
| Plaintiffs, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

## ORDER AND OPINION

This matter is before the Court on Defendant's Motion to Dismiss (Doc. 14). Plaintiffs filed a Response in Opposition (Doc. 16), to which Defendant filed a Reply (Doc. 17) and Plaintiffs filed a Sur-Reply (Doc. 20). This matter is fully briefed and ripe for the Court's review. For the following reasons, the Court **GRANTS** Defendant's Motion to Dismiss (Doc. 14).

## FACTS AS ALLEGED

On April 21, 2021, Derrick Smith was charged with Distribution of Cocaine in the Northern District of Ohio. (Compl., Doc. 1-2, ¶ 10.) He was subsequently released on certain conditions. (*Id.*) However, Mr. Smith violated these conditions several times. (*Id.* at ¶¶ 11-15.) Particularly relevant here, the district court set a hearing on April 15, 2024, in light of Mr. Smith allegedly using drugs and failing to comply with his required mental health treatment. (*Id.* at ¶ 15.) Leading up to April 15, 2024, Mr. Smith's mother told him that "he had to go to his hearing" but observed that he was a "maniac." (*Id.*) In turn, Mr.

Smith's mother contacted the probation officer to inform her that Mr. Smith did not wish to attend the hearing and advised her that Mr. Smith is "in one of his manic stages." (*Id.* at ¶ 16.) Mr. Smith had a history of "mental health issues ever since he was 17 years of age" and had been placed in a guardianship as an "incompetent person." (*Id.* at ¶ 7.)

Mr. Smith failed to appear for his court hearing, so an arrest warrant was issued. (Compl., Doc. 1-2, ¶ 17.) In order to execute this warrant, the United States Marshals Service entered Mr. Smith's residence on April 18, 2024, and told Mr. Smith that they were there to take him to court. (*Id.* at ¶¶ 18-19, 23.) Mr. Smith responded that he did not want to go with them and barricaded the bedroom door. (*Id.* at ¶¶ 23, 26.) One of the officers stated: "come on Derrick we have a warrant for you[;] we want to take you to court for your hearing[;] we done this before and never had any problem." (*Id.* at ¶ 23.) Mr. Smith responded by saying "no." (*Id.*) Around this time, Mr. Smith's relative advised law enforcement that Mr. Smith was a "maniac." (*Id.*) Despite the command from law enforcement, Mr. Smith refused to open the door or go to court. (*Id.* at ¶¶ 24-26.) Mr. Smith's relative was in and out of another room during this situation, but—after hearing banging and wrestling sounds—she observed one of the officers holding Mr. Smith in a "bear hug." (*Id.* at ¶ 27.) The other officers watched but did not help. (*Id.*) Mr. Smith's relative then went to another room and subsequently heard gunshots. (*Id.* at ¶ 27.)

Though Mr. Smith's relative was not present to observe the entire interaction, a body-worn camera captured certain developments. (Compl., Doc. 1-2, ¶ 28). Specifically, Mr. Smith ran into his room and picked up what appeared to be a wooden leg from a table or bed. (*Id.*) According to the Complaint's telling of events, Mr. Smith "was holding

it, with both hands, like a baseball bat, over his right shoulder." (*Id.*) The Complaint further alleges that Mr. Smith "stood there, looking at the U.S. Marshal[s], but he was not moving toward them, when one, or more, of the U.S. Marshal[s] negligently and wrongfully shot [Mr. Smith] eight times, killing him, without legal justification to use deadly force." (*Id.*)

**PROCEDURAL BACKGROUND**

Plaintiff Estate of Derrick Smith and Plaintiff Ericka Smith filed this federal lawsuit on May 1, 2025. (*See* Compl., Doc. 1.) Although the two-count Complaint was signed by "Ericka Smith, Pro Se," Plaintiffs are represented at this juncture. (*Id.* at Pg. ID 18.) Count I is labelled as "Violation of Federal Tort Claims Act § 2680(h)" while Count II is labelled as "Negligence." (*Id.* at ¶¶ 30-36.) Defendant responded by filing a Motion to Dismiss (Doc. 14), which is now fully briefed. (*See* Response, Doc. 16; Reply, Doc. 17; Sur-Reply, Doc. 20.)

**LAW AND ANALYSIS**

A motion to dismiss for "failure to state a claim upon which relief can be granted" tests the plaintiff's cause of action as stated in a complaint. Fed. R. Civ. P. 12(b)(6); *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). A claim for relief must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Put differently, the complaint must lay out enough facts for a court to plausibly infer that the defendant wronged the plaintiff. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). Courts must accept all allegations of material fact as true and must construe such allegations in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at

554-55; *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). However, courts are not bound to do the same for a complaint's legal conclusions. *Twombly*, 550 U.S. at 555. When a complaint contains sufficient facts to satisfy the elements of an affirmative defense put forth by a defendant, courts may grant dismissal on that basis. *Est. of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 926 (6th Cir. 2013).

## I. Materials Under Consideration

The Court begins with the preliminary question of which materials may be considered in adjudicating Defendant's Motion to Dismiss (Doc. 14). Generally, "a Rule 12(b)(6) motion should be decided solely on the complaint." *Diei v. Boyd*, 116 F.4th 637, 643 (6th Cir. 2024). But, as in many areas of the law, there are exceptions. *See Blackwell v. Nocerini*, 123 F.4th 479, 486 (6th Cir. 2024). For instance, courts may consider "exhibits attached to [a] defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Here, Plaintiffs' Complaint references publicly released body camera footage of the incident that "shows [Mr. Smith] running into his room," "pick[ing] up what appears to be a wooden leg," and "holding it, with both hands, like a baseball bat, over his right shoulder" while not moving toward law enforcement. (Compl., Doc. 1-2, ¶ 28.) Although it is unclear whether this referenced footage is the same complete body camera footage that Defendant now asks the Court to consider, the latter is certainly referenced in the Complaint and central to Plaintiffs' claims. (*See* Video, Doc. 15.) In fact, the Complaint appears to implicitly rely "on the video[] by recounting facts that could only be known to him by watching the video[]."

*Bell v. City of Southfield, Michigan*, 37 F.4th 362, 364 (6th Cir. 2022). It is therefore proper to consider the submitted footage at this stage. *See Bailey v. City of Ann Arbor*, 860 F.3d 382, 386-87 (6th Cir. 2017); *Bouie v. Alzayadi*, No. 25-10132, 2026 WL 1139649, at *3 (E.D. Mich. Apr. 2, 2026), *report and recommendation adopted*, No. 25-CV-10132, 2026 WL 1137593 (E.D. Mich. Apr. 27, 2026).

Moreover, the Sixth Circuit has "consistently held that [courts] may only consider video footage over the pleadings when the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of events." *Hodges v. City of Grand Rapids*, 139 F.4th 495, 506 (6th Cir. 2025) (cleaned up). This makes sense. After all, "if a video clearly depicts a set of facts contrary to those alleged in the complaint, this makes a plaintiff's allegations implausible." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024). Defendant contends that the body camera footage clearly and blatantly contradicts Plaintiffs' allegations, including the assertion that Mr. Smith was holding the wooden leg but "was not moving toward" law enforcement when he was shot. (Motion, Doc. 14, Pg. ID 101; Compl., Doc. 1-2, ¶ 28.)

The submitted footage shows Mr. Smith repeatedly stabbing an officer within the bedroom doorway and swinging a wooden bat-like object after returning to the bedroom—all within a span of around eleven seconds before the shooting. (Video, Doc. 15, 11:29-11:40.) Plaintiffs allege that law enforcement "negligently and wrongly used deadly force, when the use of deadly force was without a lawful basis, . . . nor was there a reasonable suspicion, probable cause, . . . or rationale for the use of the deadly force." (Compl., Doc. 1-2, ¶ 31.) The Complaint omits any mention of Mr. Smith repeatedly

stabbing one of the officers in the neck or Mr. Smith swinging the wooden object moments before the shooting. Thus, the footage "blatantly contradicts the silence in [Plaintiffs'] account" and is the "equivalent of omitting evidence of a threat." *Bell*, 37 F.4th at 367; *see also Brooks v. Roetting*, No. 1:24-CV-266, 2024 WL 4302374, at *2 (S.D. Ohio Sept. 26, 2024). Again, this is a reason to consider the footage in resolving the present Rule 12(b)(6) motion.

It is also worth highlighting that Plaintiffs have voiced no opposition to the Court considering the footage provided by Defendant at this juncture. *See Reynolds v. Szczesniak*, No. 21-2732, 2022 WL 3500191, at *3 (6th Cir. Aug. 18, 2022); *Black v. City of Royal Oak*, No. 23-12371, 2024 WL 4220711, at *2 (E.D. Mich. Sept. 17, 2024); *Trujillo v. Ranseen*, No. 3:24-CV-1198, 2025 WL 2637667, at *1 (M.D. Tenn. Sept. 12, 2025). For all these reasons, the Court therefore considers the submitted video footage. "In so doing, the Court views the facts in the light depicted by the videotape and need not credit the version of the party who asserts facts blatantly contradicted by the footage." *Black*, 2024 WL 4220711, at *2 (cleaned up). That being said, the Court views "any relevant gaps or uncertainties left by the video[]" in the light most favorable to Plaintiffs. *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022).

## II. Failure to State a Claim

Plaintiffs' Complaint lists Count 1 as "Violation of Federal Tort Claims Act § 2680(h)" and Count 2 as "Negligence." (Compl., Doc. 1-2, ¶¶ 30-36.) Though demarcated as separate claims, the substance of each claim boils down to the same following allegations:

> The Defendants' U.S. Marshal[s] Service negligently and wrongfully shot [Mr. Smith] eight times, killing him. When they killed him, they negligently and wrongfully used deadly force, when the use of deadly force was without a lawful basis, for its use, nor was there a reasonable suspicion, probable cause, and/or the existence of any recognized exception(s) thereto, to justify and/or rationale for the use of deadly force.

(*Id.* at ¶¶ 31, 34.)

Though the Federal Tort Claims Act ("FTCA") does not create independent causes of action, it constitutes a limited waiver of sovereign immunity: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances. . . ." 28 U.S.C. § 2674; *Premo v. United States*, 599 F.3d 540, 544 (6th Cir. 2010). In turn, "liability under the FTCA is usually determined by referencing state law." *Premo*, 599 F.3d at 545. "When law enforcement functions are involved," for instance, "the inquiry into governmental liability must include an examination of the liability of state entities under like circumstances." *Evans v. United States*, No. 3:15-CV-464, 2017 WL 1208552, at *3 (E.D. Tenn. Mar. 31, 2017), *aff'd*, 728 F. App'x 554 (6th Cir. 2018).

Defendant cites Ohio Revised Code § 2744.03 for the proposition that the officers' actions are immune from liability because they did not act "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code. § 2744.03(A)(6); *see also Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 543 (6th Cir. 2015) (explaining that § 2744.03(A) outlines when a government employee is personally immune from liability); (Motion, Doc. 14-1, Pg. ID 105-08.) Specifically, Defendant seeks to assert this state-employee immunity within the FTCA context. (Motion, Doc. 14-1, Pg. ID 105-106). Numerous

federal courts have applied state-employee immunities when the United States is sued under the FTCA. *See, e.g., Priah v. United States*, 590 F. Supp. 2d 920, 943 (N.D. Ohio 2008) (concluding that "the United States is entitled to assert any defense of immunity available to its employee or to the government, including state law immunities"); *Valdez v. United States*, 58 F. Supp. 3d 795, 828-29 (W.D. Mich. 2014) (applying state-law immunity to FTCA claims); *Howard v. Taggart*, No. 4:05-CV-1114, 2007 WL 2840369, at *8 (N.D. Ohio Sept. 27, 2007); *Evans*, 2017 WL 1208552, at *3; *Villafranca v. United States*, 587 F.3d 257, 263-64 (5th Cir. 2009); *Medina v. United States*, 259 F.3d 220, 225 n.2 (4th Cir. 2001).

Plaintiffs concede that Defendant "can assert" the defenses within Ohio Revised Code § 2744.03(A)(6) but contend that the ultimate determination of whether such immunity should apply is a factual issue. (Response, Doc. 16, Pg. ID 116; Sur-Reply, Doc. 20, Pg. ID 135.) Though Plaintiffs "need not affirmatively demonstrate an exception to immunity in [the C]omplaint," courts may dismiss claims under § 2744.03(A)(6) at the pleadings stage when a "complaint is devoid of allegations tending to show that the defendants acted in at least bad faith." *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 766 (6th Cir. 2022) (cleaned up). "The question of whether a governmental employee or political subdivision is entitled to statutory immunity [under § 2744.03(A)(6) is] a question of law for a court's determination." *Ruble v. Escola*, 898 F. Supp. 2d 956, 981 (N.D. Ohio 2012) (citing *Feitshans v. Darke Cnty.*, 686 N.E.2d 536, 539 (Ohio Ct. App. 1996)). One more legal standard helps set the stage: "When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, [courts] may review the state-law immunity defense through the lens of the federal

qualified immunity analysis." *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 602 (6th Cir. 2020) (quotations omitted).

As § 2744.03 provides immunity from litigating a lawsuit altogether, it stands to reason that courts should "resolve the question as soon as possible." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1003 (6th Cir. 2024) (speaking as to the qualified immunity context); *see Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 524 (6th Cir. 2013) ("Immunity under Ohio Rev. Code § 2744.03, like federal-official immunity, is an exemption from suit . . . ."); *Chesher v. Neyer*, 477 F.3d 784, 793-94 (6th Cir. 2007). Though adjudication of qualified immunity is regularly reserved for summary judgment, courts "cannot defer a decision on qualified immunity merely because it must make the decision on a Rule 12 motion." *Saalim*, 97 F.4th at 1003; *see Hodges v. City of Grand Rapids*, 139 F.4th 495, 504 (6th Cir. 2025); *Brown v. Giles*, 95 F.4th 436, 441 (6th Cir. 2024) (concluding that the defendant "appropriately raised qualified immunity at the motion to dismiss stage"). Specifically, "when uncontroverted video evidence easily resolves a case, [courts] honor qualified immunity's principles by considering the videos." *Bell v. City of Southfield, Michigan*, 37 F.4th 362, 364 (6th Cir. 2022).

Turning to the relevant inquiry here, recklessness amounts to "'an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that this risk is greater than that necessary to make the conduct negligent.'" *Sabo v. City of Mentor*, 657 F.3d 332, 337 (6th Cir. 2011) (quoting *Shalkhauser v. City of Medina*, 772 N.E.2d 129, 136 (Ohio Ct. App. 2002)). Within the law enforcement setting, "if an officer has probable cause to believe

that a person poses an immediate threat of serious injury, the officer's use of deadly force against that person is not reckless." *Id.* (citing *Kendzierski v. Carney*, No. 22739, 2005 WL 3482397, at *7 (Ohio Ct. App. Dec. 21, 2005)). When an officer, in other words, "reasonably and genuinely perceived the suspect as posing a threat of serious harm to the officer or others," then "the officer's use of deadly force can be seen as a deliberate and measured response to neutralize the threat, rather than as conduct reflecting a conscious disregard of, or indifference to, the obvious risk of harm inherent in shooting another person." *Est. of Lewis v. Anderson*, 2026-Ohio-2096, 2026 WL 1602020, at *6 (Ohio Ct. App. June 4, 2026).

Ohio courts addressing § 2744.03(A)(6) immunity in the deadly force context have found that the "Fourth Amendment['s] objective-reasonableness standard may serve as a helpful analytical tool [and a useful threshold inquiry] because it helps distinguish objectively reasonable conduct from conduct reflecting a higher degree of culpability." *Anderson*, 2026 WL 1602020, at *5; *see also Hayes v. Columbus*, 2014-Ohio-2076, 2014 WL 2048176, at *7 (Ohio Ct. App. May 15, 2014) (similar); *Kendzierski*, 2005 WL 3482397, at *6 (similar); *Martin v. Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (explaining that where "resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims"); *Evans*, 2017 WL 1208552, at *3 (collecting cases that applied the reasonableness standard in FTCA cases involving deadly force).

Accordingly, the following federal case law concerning the reasonableness of deadly force proves insightful. When law enforcement makes "split-second judgments .

. . in tense, uncertain, and rapidly evolving circumstances," courts must view the use of deadly force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Eastep v. City of Nashville, Tennessee*, 156 F.4th 819, 828 (6th Cir. 2025) (quotations omitted). "Although the fact that a situation unfolds quickly does not, by itself, permit officers to use deadly force, [courts] must afford a built-in measure of deference to an officer's on-the-spot judgment." *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (cleaned up). For instance, a law enforcement officer "may use deadly force when a confrontation unfolds in such rapid succession that he has no chance to realize that a potentially dangerous situation has evolved into a safe one." *Id.* at 436-37 (cleaned up). "The situation at the precise time of the shooting will often be what matters most, but [courts] recognize that earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Eastep*, 156 F.4th at 828 (cleaned up). At the end of the day, courts exercise caution against merely substituting their own opinions of "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000) (quotation omitted); *see Kendzierski*, 2005 WL 3482397, at *6.

Bearing these standards in mind, the Court turns to Plaintiffs' allegations and the uncontested video footage. To set the scene, the officers arrived at Mr. Smith's residence to execute an arrest warrant following his failure to appear for a court hearing. (Compl., Doc. 1-2, ¶¶ 6, 17-18.) Mr. Smith struggled with mental health issues and was found to be legally "incompetent." (*Id.* at ¶ 7.) At least one of the officers was told that Mr. Smith was in the midst of a manic episode. (*Id.* at ¶ 23.) The officers requested that Mr. Smith

leave with them in order to attend court. (*Id.*) Specifically, one officer implored: "[C]ome on Derrick we have a warrant for you[;] we want to take you to court for your hearing[;] we done this before and never had any problem." (*Id.*) Mr. Smith refused and, instead, continued to barricade himself within a bedroom. (*Id.* at ¶¶ 23-26; Video, Doc. 15, 7:11-11:20.)

The body camera footage shows the officers outside of the bedroom doorway. (Video, Doc. 15, 7:50-11:20.) One of the officers states: "Hey Darren, we don't want you to get hurt. Your PO wants to talk to you. You have to understand, if I have to break down this door and you get physical with us, we [are] going to have to charge you." (*Id.* at 9:30.) Still, Mr. Smith refuses to comply. (*Id.* at 9:40-10:00.) As the officers attempt to open the door, one of them states, "He just threw something." (*Id.* at 10:15.) An officer further states that he was hit in the head. (*Id.*) Around fifteen seconds later, an officer voices that Mr. Smith has "some kind of weapon," while another officer soon thereafter states that Mr. Smith has a bat. (*Id.* at 10:30.) Ultimately, the door is fully opened; Mr. Smith can be seen moving toward the officers. (*Id.* at 11:22-30.) One of the officers deploys a taser, but it fails to neutralize Mr. Smith. (*Id.* at 11:22.) Mr. Smith then stabs an officer at least twice in the neck with an object. (*Id.* at 11:28.)

Immediately after the stabbing, Mr. Smith returns to the small bedroom and arms himself with a long wooden object resembling a bat. (Video, Doc. 15, 11:36; Compl., Doc. 1-2, ¶ 28.) He then swings the wooden object at one of the officers, who raises his arm to protect himself. (Video, Doc. 15, 11:37.) Two officers draw their guns as Mr. Smith swings the wooden object in a downward direction. (*Id.* at 11:39.) Consecutive gunshots can then

be heard. (*Id.* at 11:39-43.) Though a riot shield momentarily blocks Mr. Smith from the camera's view when the first shot is fired, he can be seen continuing to swing the bat both before and after the first shot. (*Id.*)

Thus, this situation involved "split-second judgments" by the officers in a "tense, uncertain, and rapidly evolving" environment with an individual both resisting arrest and attacking officers. *Eastep*, 156 F.4th at 828 (quotations omitted). The condensed timeline is particularly telling. All told, about eleven seconds elapsed between Mr. Smith repeatedly stabbing an officer in the neck, Mr. Smith swinging the bat, and the shooting. The gunshots were fired just three seconds after Mr. Smith swung the bat at one of the officers and about one second after Mr. Smith swung the bat in a downward direction. Accordingly, the officers responded with deadly force after "reasonably and genuinely perceiv[ing] the suspect as posing a threat of serious harm." *Anderson*, 2026 WL 1602020, at *6; *see also Eastep*, 156 F.4th at 829 ("The video shows that the eight officers began to fire only after Mr. Eastep took threatening steps toward them, removed an object from his pocket, and pointed it at the officers from a shoulder-level position."); *Evans*, 2017 WL 1208552, at *4 ("Mr. Evans' actions alone, without more, render the officer's belief that [Mr.] Evans posed a danger to the officers in the room sufficient to justify the use of deadly force.").

The cases cited by Plaintiffs, in contrast, are all distinguishable. (*See* Response, Doc. 16, Pg. ID 114.) *Irvin v. City of Shaker Heights* involved a situation in which the plaintiff claimed that he was "mostly passive under unrelenting beating and kicking by the Individual Officers" that supported a potential finding of recklessness. 809 F. Supp. 2d

719, 738 (N.D. Ohio 2011). Similarly, the case of *Martin v. City of Broadview Heights* included allegations that law enforcement acted recklessly by restraining and placing "excessive weight on [the plaintiff] while he was face down." 712 F.3d 951, 957, 963 (6th Cir. 2013). The video here portrays a different story of resistance and threatening aggression.

At the same time, the Court certainly appreciates Plaintiffs' argument that resolution of questions regarding recklessness and immunity are not always resolvable at the Rule 12(b)(6) stage. As opposed to a bright-line rule, however, case law confirms that such dismissals can be appropriate. *See, e.g., Carmichael v. City of Cleveland*, 571 F. App'x 426, 436 (6th Cir. 2014) (affirming dismissal of state-law claims against defendants on the basis of § 2744.03(A)(6) because the plaintiff had failed to offer factual allegations to support the conclusory allegations that defendants acted recklessly); *Brooks*, 2024 WL 4302374, at *5-7 (granting the defendant's motion for judgment on the pleadings in light of the video submission). Several Ohio appellate court decisions are also in accord. *See, e.g., Miller v. Van Wert Cty. Bd. of Mental Retardation & Dev. Disabilities*, 2009-Ohio-5082, 2009 WL 3068807, at *7 (Ohio Ct. App. Sept. 28, 2009) (concluding that the trial court erred in denying the motion to dismiss when the "complaint failed to allege any facts against [the defendant] that could conceivably meet [§ 2744.03(A)]"); *Tuleta v. Med. Mut. of Ohio*, 6 N.E.3d 106, 116-18 (Ohio Ct. App. 2014) (similar); *Parmertor v. Chardon Loc. Schs.*, 47 N.E.3d 942, 951 (Ohio Ct. App. 2016) (similar).

Plaintiffs' Complaint alleges that law enforcement "negligently and wrongfully used deadly force . . . without a lawful basis." (Compl., Doc. 1-2, ¶¶ 31, 34.) However, as

explored above, this conclusory allegation is made implausible by reviewing the uncontested video footage. Dismissal of Plaintiffs' claims is therefore appropriate.

**CONCLUSION**

For all these reasons, the Court **GRANTS** Defendant's Motion to Dismiss (Doc. 14). Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**. This matter is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: Matthew W. McFarland
JUDGE MATTHEW W. McFARLAND
(sitting by assignment)